1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

----oo0oo----

11

RICHARDO MEDINA-TEJADA,

12                                        NO. CIV. S-04-138 FCD/DAD

Plaintiff,

13

14        v.                              MEMORANDUM AND ORDER

SACRAMENTO COUNTY; SACRAMENTO
15 COUNTY SHERIFF'S DEPARTMENT;
SHERIFF LOU BLANAS; and DOES 1
16 through XXX, inclusive,

17        Defendants.

18                              ----oo0oo----

19        This matter is before the court on defendants Sacramento

20 County (the "County"), Sacramento County Sheriff's Department

21 ("Sheriff's Department"), and Sacramento County Sheriff Lou

22 Blanas' ("Sheriff Blanas") (collectively, "defendants") motion

23 for summary judgment, or alternatively, summary adjudication of

24 plaintiff Richard "Kimberly" Medina-Tejada, a pre-operative male

25 to female transgender individual's,[1] second amended complaint

26 against them.  Said complaint, filed May 27, 2004, alleges claims

27

28        [1]   Plaintiff prefers to be identified as female.  As such,
the court refers to plaintiff herein in the female gender.

1   against defendants,[2] pursuant to 42 U.S.C. § 1983, for violation

2   of plaintiff's rights under the Fourth, Eighth, and Fourteenth

3   Amendments while she was an inmate at the Sacramento County Main

4   Jail, as well as claims against unnamed "Doe" defendants for

5   negligence, "assault, battery, rape[3] and conspiracy," negligent

6   infliction of emotional distress, and intentional infliction of

7   emotional distress.  With respect to the claims against them,

8   defendants argue for summary judgment on the ground that their

9   alleged conduct does not amount to a violation of the subject

10  Amendments.  With respect to the state law claims, defendants

11  request dismissal of the claims on the basis that plaintiff

12  failed to timely amend her complaint to add claims against

13  specific defendants.

14      The court heard oral argument on the motion on February 10,

15  2006.  By this order, the court now renders its decision on the

16  motion, granting in part and denying in part defendants' motion.

17  With respect to plaintiff's state law claims, said claims must be

18  dismissed; plaintiff did not timely amend her complaint and

19  offers no basis for leave to amend now, at this late juncture in

20  the case.  With respect to plaintiff's claims against defendants,

21  they survive defendants' motion as triable issues of fact remain

22  regarding the constitutionality of plaintiff's classification as

23

24          [2]   Sheriff Blanas is sued in both his official and
    individual capacities.

25          [3]   Plaintiff alleged in her complaint that: "On two
26  occasions, [she] was physically forced into a straight male
    inmate's cell and forcibly raped."  (2nd Am. Compl at ¶ 18.)
27  However, at her deposition, she testified that she was *not* raped
    at any time while incarcerated at the County Jail.  (Defs.' Reply
28  Stmt. of Undisp. Facts ["SUF"], filed Feb. 3, 2006, at 4.)   Thus,
    allegations of rape are not at issue in this case.

                                  2

a "T-Sep" inmate and her resulting treatment thereby.

**BACKGROUND**[4]

### 1.   <u>Re: Plaintiff</u>

Plaintiff is a pre-operative male to female transgender individual.  (SUF 1.)  By the age of 12, she held herself out as female, and she began taking hormones available in her native Mexico.  While plaintiff's transgender self-identity was clear at an early age, she was not accepted as such in Mexico; she was constantly humiliated, physically intimated, harassed, and tormented throughout her life.  She sought to escape these conditions by fleeing to the United States, immigrating illegally.  (Pl.'s Decl., filed Jan. 26, 2006, at ¶ 3.)

In or about March 2003, plaintiff was seized by immigration authorities and detained in Santa Clara County.  She was transferred between various facilities, ultimately arriving at the Sacramento County Main Jail, as a pre-deportation detainee, on June 11, 2003.  (<u>Id.</u> at ¶ 6.)  Plaintiff was released from custody on September 26, 2003.[5]  The events giving rise to this action relate to this 3½ month-period.  (SUF 2, 3.)

Upon arrival at the Sacramento County Main Jail, plaintiff was immediately classified "T-Sep," or "total separation."  (<u>See</u> Defs.' Reply to Pl.'s Stmt. of Undisputed Facts ["PUF"], filed

---

[4]    Unless otherwise noted, the facts recited herein are undisputed.  Where the facts are in dispute, plaintiff's version of the facts is recounted.  (Defs.' Reply Stmt. of Undisp. Facts ["SUF"], filed Feb. 3, 2006.)

[5]    On August 27, 2003, plaintiff was granted asylum by a San Francisco immigration court because of her transgender identity.  However, she was not released from the County Jail until immigration officials dropped their appeal of the asylum judgment.  (PUF 25.)

3

Feb. 3, 2006, at 7.)  However, she was not told she was a "T-Sep" inmate or told the ramifications of that classification. (PUF 8.)

On her first day at the jail, plaintiff made an oral request for hormone pills.  She received the pills a week later. (SUF 37.)

While housed at the jail, plaintiff was allowed out of her cell for recreation, phone calls or showers only between the time of 2:00 a.m. and 3:00 a.m. in the morning.  (Pl.'s Decl at ¶ 10.) Plaintiff was only allowed out of her cell, at that time, once or twice during her entire stay at the jail for purposes of recreation and phone calls.  She was allowed out of her cell, at that time of the morning, two to three times a week for showers. (Id.)

Additionally, plaintiff participated in "laundry calls," twice a week, where she was subjected to "catcalls" and sexual remarks from other inmates who were able to observe her naked to the waist with her breasts exposed.  All inmates were required to participate in the laundry calls in order to obtain fresh clothes, and all inmates were bare-chested, wearing only a towel around their waists.  (SUF 34.)  Plaintiff testified, at her deposition, that the lewd remarks were made in Spanish and that she did not believe the jail guards could understand the remarks. In her declaration filed in opposition to the motion, she stated that the "guards watched and heard" the comments and "did nothing to stop [the] conduct."  (Pl.'s Decl. at ¶ 11.)  The guards did not make any remarks to plaintiff during the laundry calls.  (SUF 35.)

4

During one particular laundry call, plaintiff requested a bra from the inmates who handed out the laundry.  Plaintiff did not make a request specifically to the guards or the infirmary. Plaintiff received a bra within approximately a month of her request.  (SUF 36.)

On September 4, 2003, Sheriff Deputy Tiffany Mendonsa reported to plaintiff's cell to escort plaintiff to the infirmary.  (SUF 22.)  Plaintiff required an escort due to her status as a T-Sep inmate.  (SUF 23.)  When Mendonsa arrived at plaintiff's cell, plaintiff had her hair arranged "up," in violation of jail policy.  (SUF 24.)  Mendonsa ordered plaintiff to let her hair down and plaintiff complied.  (SUF 25.) Plaintiff then exited the cell, walking ahead of Mendonsa. (Id.)

While plaintiff exited, Mendonsa ordered plaintiff to "bury" her hands in her pants.  Plaintiff, who does not speak English, could not fully understand the commands given by Mendonsa. Nonetheless, she initially complied with the request and buried in her hands in her pants.  (SUF 27.)  According to Mendonsa, however, plaintiff subsequently removed her hands from her pants; Mendonsa informed plaintiff that she would be taken back to her cell if she did not comply with the rules.  Mendonsa claims she had no reason to suspect a language barrier with plaintiff because just moments before plaintiff complied with Mendonsa's oral commands to take her hair down, step out of the cell, and bury her hands in her pants, all of which were spoken in English. (SUF 28.)  Plaintiff testified that she did not understand Mendonsa's last command and thought she was being ordered to return to her cell.  (SUF 29.)  As a result, plaintiff turned

towards the pod door intending to go through the door back to her cell. (SUF 30.)

As a T-Sep inmate, plaintiff was not allowed into the pod common area with the general population inmates who were out of their cells. (SUF 31.)  Consequently, according to Mendonsa, for plaintiff's safety, she grabbed plaintiff to keep her from entering the pod. (Id.)  According to Mendonsa, plaintiff resisted Mendonsa's physical intervention and Mendonsa performed a departmentally-approved take down and control maneuver. (Id.)  Plaintiff, however, maintains that she did not resist Mendonsa in any way. (PUF 15.)  She does not know why Mendonsa attacked her and threw her to the ground; according to plaintiff, Mendonsa placed her foot on plaintiff's back, pulled plaintiff's hair, and called plaintiff a "bitch" and "hooker." (SUF 33.)

Plaintiff claims that as a result of the incident, she suffered a fractured wrist and damage to her breast implant, which ruptured, causing an infection.  While she was seen at the infirmary later on the evening of the incident and given "some pills," she asserts thereafter her injuries went untreated for three days while she remained in her cell. (PUF 17, 18, 19.)  Plaintiff sought psychological counseling in the jail after the incident.  She made two requests, yet only saw a counselor once. (SUF 9.)

**2. Re: Tates Decision and Order[6]**

On March 11, 2003, United States District Judge Owen M. Panner, issued "Findings of Fact and Conclusions of Law" after a court trial in the case of Tates v. Sheriff Blanas, et al., Civ. 00-2539, United States District Court, Eastern District of California. Plaintiff Jackie Tates, a pre-operative male to female transgender, brought the action *pro se* against Sacramento County Sheriff Lou Blanas and two jail employees, challenging the constitutionality of the conditions of her confinement at the Sacramento County Main Jail; plaintiff Tates was housed at the jail as a pretrial detainee. (PUF 1.) The Tates defendants were represented by defendants' counsel in this case.

Ultimately, Judge Panner held that:

> Defendants erred by automatically classifying all transgender inmates as T-Sep, as that classification is administered at this Jail.[7] The necessary consequence of this classification scheme is to needlessly deprive transgender pretrial detainees of basic human needs and of privileges available to all other inmates, and to needlessly subject transgender inmates to harsh conditions.

(PUF 2, Ex. A at 21:12-19.) Indeed, Judge Panner found that the

---

[6] Defendants object to any reliance on the Tates decision, arguing it is either "irrelevant" to the issues presented in this case and/or plaintiff is barred from relying on it because she did not *plead* improper classification, pursuant to Tates, in her complaint. For the reasons set forth below, the court overrules defendants' objections. The Tates decision is properly considered by the court and is therefore discussed here as part of the background of this case.

[7] In that regard, Judge Panner found that the jail "automatically classifies all biologically male transgender inmates as T-Sep, regardless of their behavior, criminal history, whether they pose a danger to others, or any other characteristics. Although Jail policy requires that each inmates' classification be periodically re-examined, in practice an exception is made for transgender inmates, since there is no possibility that the Jail will change their classification." (PUF 1, Ex. A at 6:13-20.)

jail's T-Sep classification was intended for "inmates who violate

rules" in order to be "punished by [the] placement in [this]

special disciplinary category with very restricted privileges."

(Id. at 5:22-24.)   Yet, transgender inmates were, generally,

inexplicably placed in this category, rather than in "P.C." or

"protective custody," a category designed for inmates who the

jail believed required special protection.  (Id. at 5:19-22.)

Judge Panner held, "Defendants have failed to establish any

legitimate reason for automatically treating transgender inmates

as inherently more dangerous than most other inmates."  (Id. at

9:12-15.)

     As a result of the jail's treatment of transgender inmates

"in a manner ordinarily reserved for the most dangerous inmates

(id. at 8:20-22)," transgender inmates were subjected to "many

burdens and restrictions not shared by other inmates (id. at

6:11-12)," which included: (1) unlike most other inmates, T-Sep

inmates were heavily shackled and manacled while transported to

court or being moved inside the jail and even while in a holding

cell ("This is done without regard to whether the particular

individual poses a risk to the safety of other inmates or the

staff, or is a threat to escape.") (Id. at 9:1-3); (2) T-Sep

inmates are prohibited from attending religious services or bible

study with other inmates (Id. at 9:24-26); (3) T-Sep inmates do

not receive adequate "day room" and outdoor recreation time, both

in terms of quantity and quality (this is largely a product of

the jail's decision to "prohibit transgender inmates from having

conduct with other inmates, including each other") (Id. at 12:5-

11); (4) T-Sep inmates' cells are cleaned less than other inmates

(15:19-21); and (5) because showers are taken during "day room" time, T-Sep inmates are offered less opportunity to shower (Id. at 16:13-16).  Additionally, plaintiff Tates, specifically, was refused a bra, withstood daily verbal harassment, and was forced in order to obtain clean clothes to "walk bare-breasted while the entire pod watches the show through the cell door windows." (Id. at 18:17-20.)

Based on these findings, Judge Panner ordered defendants to "adopt a classification scheme that more appropriately addresses the special circumstances of transgender inmates." (Id. at 22:12-13.)

> Transgender inmates are entitled to be treated with the
> same respect as other inmates.  This attitude must be
> conveyed from the top on down.  Sheriff Blanas, and
> senior Jail officials, must make it absolutely clear
> that abuse, ridicule, "faggot" jokes, and other
> inappropriate behavior will not be tolerated-whether
> by employees, trustees, or other inmates.  Jail
> officials must take appropriate disciplinary measures
> if that policy is violated.

(Id. at 24:10-17.)  Judge Panner directed the Tates defendants and their counsel to file by April 1, 2003, a "proposed plan for correcting the deficiencies noted [in his decision]." (Id. at 24:21-23.)

On April 1, 2003, defendants' counsel proposed to Judge Panner to classify "any and all transgender inmates as Protective Custody-Administrative Segregation (PC-Ad Seg) inmates." (PUF 1, Ex. B).  In particular, the proposal submitted by defendants' counsel provided that: (1) transgender inmates will be housed in single cells, but will be able to participate in dayroom and outdoor recreation with other transgender inmates also classified as PC-Ad Seg.; (2) classification of transgender inmates will be

9

reviewed routinely as is done with all inmates; and (3)
transgender inmates will have access to cleaning supplies to
perform cleaning chores.  The plan further provided that the
"Sacramento County Main Jail . . . will not tolerate any
discrimination, harassment or abuse of inmates by other inmates,
including trustees, or jail staff." (Id. at 2:9-11.)  Defendants
reserved the right to determine upon a "case-by-case basis" the
need to classify a transgender inmate as T-Sep.  (Id. at 2:19-
25.)

On May 19, 2003, Judge Panner adopted defendants' proposed
plan, stating "Sheriff Blanas, his successors and subordinates,
shall faithfully implement the Plan and adhere to it."  (Id. at
1.)

**STANDARD**

The Federal Rules of Civil Procedure provide for summary
judgment where "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact."  Fed. R. Civ. P. 56(c); see California v.
Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  The evidence must
be viewed in the light most favorable to the nonmoving party.
See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en
banc).

The moving party bears the initial burden of demonstrating
the absence of a genuine issue of fact.  See Celotex Corp. v.
Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to
meet this burden, "the nonmoving party has no obligation to
produce anything, even if the nonmoving party would have the

ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. See Nissan Fire & Marine, 210 F.3d at 1107. Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**ANALYSIS**

Preliminarily, the court considers defendants' objections to plaintiff's reliance on the Tates decision and order.

Defendants first argue that plaintiff should be barred from claiming improper classification in violation of the Tates order because plaintiff's second amended complaint does not contain allegations of improper classification. Defendants assert that "no where in the factual allegations . . . does Plaintiff allege that Defendants improperly classified her as a T-SEP inmate, or that her classification status was intended to punish her, or to make her more vulnerable to harassment or mistreatment of any

11

kind by inmates or jail personnel." (Reply, filed Feb. 3, 2006, at 3:4-8.) Defendants further argue that plaintiff did not seek to discover information regarding the effect of classification in discovery. (Id. at 5:17.) As a result, defendants claim they did not address T-Sep classification in the moving papers because they were not "on notice that Plaintiff contends her classification was in any way wrongful or harmful." (Id. at 5:24-25.) Defendants finally maintain that to allow plaintiff to make this argument now would prejudice them as discovery has closed and the dispositive motion cut-off has passed.

Defendants' arguments are unavailing for several reasons. Plaintiff was not required to *plead* a violation of the <u>Tates</u> order, or allege specifically that her classification as T-Sep was improper. Federal Rule of Civil Procedure 8(a) sets forth the federal notice pleading standard--plaintiff is only obligated to make a "short and plain statement" of her claim. Plaintiff did so here: (1) she alleged defendants knew of her transgender identity (2nd Am. Compl at ¶ 19); (2) she alleged they classified her as "TSEP, e.g. in total separation from other inmates, for this very reason (Id.);" and (3) she alleged the unlawful treatment she received while housed at the jail (Id. at ¶s 13-25). While she did not explicate a nexus between her "TSEP" classification and "unlawful" treatment, she is not obligated to do so under Rule 8. Defendants were provided adequate notice of the nature of her claim; she expressly alleged that the "*policies*" of defendants forced her "into a world which moved between solitary confinement and fear of assault." (Id. at ¶ 19.)

Such "policies" certainly included classification policies regarding transgender inmates.  Indeed, defendants and their lawyers proposed the modified transgender classification "policies" on April 1, 2003, which were embodied in Judge Panner's decision.  In light of that fact, defendants' decision not to address a federal court order expressly modifying T-Sep classification policy for transgender inmates in its moving papers is troubling.  Many of the *very same* conditions of confinement which gave rise to the <u>Tates</u> order are alleged by plaintiff in her complaint (*i.e.*, segregated housing,[8] inadequate dayroom and recreation time, inadequate opportunity to shower).

In sum, plaintiff is not only *not* barred from reliance on the <u>Tates</u> order but is arguably entitled to rely on its express protections since that court order set forth the standards defendants must employ in classifying and treating transgender inmates.  Indeed, defendants and their counsel had a countervailing duty to this court, from the very outset of this litigation, to address this federal court order in light of plaintiff's claims.

Defendants alternatively argue that the court should disregard <u>Tates</u> because it is "irrelevant" to plaintiff's action in that the decision does not apply "personally" to her.  (PUF 2.)  According to defendants, Judge Panner's decision pertained

---

[8]     While both the <u>Tates</u> plaintiff and plaintiff here object to their "segregated" housing, the essence of their complaints is not *per se* the segregated housing itself but rather the *isolation* they endured as a result of their T-Sep classifications.  Indeed, Judge Panner's order requires continued "segregation" of transgender inmates, via the "PC-Ad Seg" classification, but not punitive segregation that results in the denial of privileges or access to jail facilities.

13

to the jail's method of classifying transgender individuals *before* plaintiff's incarceration.  (Id.)  Defendants' argument is disingenuous.  Judge Panner's final order clearly applied prospectively, stating "Sheriff Blanas, his successors and subordinates, shall faithfully implement the Plan and adhere to it."  (RUF 1, Ex. B at 1.)  That Plan provided for the equal treatment of transgender inmates and required their classification to be "PC-Ad Seg."  Transgender inmates were to be classified as "T-Sep" *only* upon a case-by-case determination of the specific need for such classification based on the transgender individual's particular violent propensity.  (Id.) The Tates decision and order issued before plaintiff's pretrial incarceration are central to the instant action, and for the reasons described below, provide a basis for denial of defendant's motion.

### 1.   Section 1983 (Based on Violation of Plaintiff's Fourth and Eighth Amendment Rights)

The parties do not dispute that plaintiff was a pre-deportation detainee while housed at the Sacramento County Main Jail.  The parties also agree that as such, plaintiff's status was similar to a pretrial detainee.  As a pretrial detainee, plaintiff concedes the Fourth and Eighth Amendments are inapplicable to her.  (Opp'n at 8:1-4.)[9]; see e.g. Bell v. Wolfish, 441 U.S. 520, 535 (1979) (a pretrial detainee's Section

---

[9]   Plaintiff states in opposition: "The defendants' summary judgment . . . motion is preoccupied initially with challenging the complaint's [allegations] under the Eighth and Fourth Amendments.  As discussed above, and acknowledged by defendants, those amendments are inapplicable to pretrial detainees such as plaintiff."

1983 claim arises under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment's cruel and unusual punishment clause, which applies only to post-conviction prisoners). Accordingly, to the extent plaintiff alleged a claim pursuant to Section 1983 based on violations of her Fourth and Eighth Amendment rights, her claims are dismissed.

**2. Section 1983 (Based on Violation of Plaintiff's Fourteenth Amendment Rights)**

To state a claim under § 1983, plaintiff must demonstrate that (1) defendants acted under color of law, and (2) defendants deprived plaintiff of rights secured by the Constitution or federal statutes. <u>Gibson v. U.S.</u>, 781 F.2d 1334, 1338 (9th Cir. 1986). Defendants do not dispute that they were acting under color of law in regard to the conduct in question. Therefore, the court's analysis will focus only on the issue of whether there is a triable issue of fact that defendants deprived plaintiff of constitutionally protected rights, namely her due process rights under the Fourteenth Amendment.

It is that amendment which is applicable here. "The more protective fourteenth amendment standard applies to conditions of confinement when detainees . . . have not been convicted of a crime." <u>Jones v. Blanas</u>, 393 F.3d 918, 931 (9th Cir. 2004) (internal quotations omitted).

> The Fourteenth Amendment requires the government to do more than provide the minimal civilized measure of life's necessities, for non-convicted detainees. Rather, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.

<u>Id.</u> (internal quotations and citations omitted). At a bare

minimum, a pretrial detainee "cannot be subjected to conditions that 'amount to punishment.'" Id. at 932 (quoting Bell, 441 U.S. at 536).  The Ninth Circuit has recognized that punitive conditions may be shown:

> (1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose, or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.

Id. at 932 (internal quotations and citations omitted).  To prevail on a Fourteenth Amendment claim regarding conditions of confinement, the "confined individual need not prove 'deliberate indifference' on the part of government officials." Id. at 934.[10]

Applying these standards to plaintiff's Section 1983 claim, the court addresses the claim against each defendant in turn.

With respect to the County (and the corollary claim against the Sheriff's Department), "[a] municipality may be held liable under a claim brought under § 1983 only when the municipality inflicts an injury, and it may not be held liable under a respondeat superior theory." Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1185 (9th Cir. 2002) (citing Monell v. New York

---

[10]     In Jones, the Ninth Circuit, considering conditions of confinement at the Sacramento County Main Jail for a *civilly detained* inmate awaiting adjudication under California's Sexually Violent Predator Act, held "a presumption of punitive conditions arises" when such a detainee is "confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held." Id. at 932, 934.  Such a civilly detained inmate must be "afforded the 'more considerate' treatment to which he is constitutionally entitled." Id. at 934.

City Dept. of Social Services,436 U.S. 658, 694,(1978)).  The
Ninth Circuit has provided that county liability can be
established by direct liability and liability by omission.  Id.
at 1186.  Here, plaintiff argues direct liability of the County
for its policy classifying, automatically, transgender inmates as
"T-Sep."

    To establish direct liability, plaintiff must show "that a
municipality itself violated someone's rights or that it directed
its employee to do so." Gibson, 290 F.3d at 1185 (*citing* Board
of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404
1994)).  A plaintiff may hold a municipality liable under section
1983 for its official acts pursuant to county policy, regulation,
custom, or usage.  Chew v. Gates, 27 F.3d 1432, 1444 (9th Cir.
1994) (*citing* Monell, 436 U.S. at 690-91, 694).  In order for the
County to be liable under a direct liability theory, the County
must have (1) had a policy that posed a substantial risk to the
plaintiff and (2) known that its policy posed this risk.  Gibson,
290 F.3d at 1188.  In addition, a plaintiff must then demonstrate
that the municipal policy "caused" the constitutional
deprivation.  Id.  A municipal policy "causes" injury where it is
the "moving force" behind the violation.  Chew, 27 F.3d at 1444
(*citing* Monell, 436 U.S. at 690-91, 694).

    It is undisputed that plaintiff was classified "T-Sep" upon
her arrival at the Sacramento County Main Jail.  Plaintiff
maintains that that classification was a direct violation of
Judge Panner's order, which was in place prior to her arrival at
the jail.  Defendants offer *no* evidence in rebuttal to establish
that they properly classified her "T-Sep," after making a

17

specific determination that it was required due to her violent
characteristics.  The court cannot therefore grant summary
judgment in the County's favor.

Importantly, the Ninth Circuit, in <u>Jones</u>, addressed the very
due process issues created by the Sacramento County Main Jail's
"T-Sep" classification policy.  The court found that Sheriff
Blanas' declaration submitted in that case, stating that T-Sep
was "not a disciplinary category," "belied by the restrictions
Jones and others faced while in T-Sep," which included
"significant limitations on, or total denials of, recreational
activities, exercise, phone calls, visitation privileges, out-of-
cell time, access to religious services, and access to the law
library."  <u>Jones</u>, 393 F.3d at 934.  The court thus held "a
presumption of punitiveness arises as to Jones' year in T-Sep."
<u>Id.</u>  The court accordingly reversed the district court's grant of
summary judgment in favor of defendant County of Sacramento and
Sheriff Blanas.

For the same reasons, the court does not grant summary
judgment in favor of the County here.  Plaintiff has proffered
sufficient evidence,[11] with particular reliance on <u>Tates</u>, to

---

[11]   As set forth above, plaintiff proffers evidence that
she was isolated by virtue of her T-Sep classification; she could
not leave her cell without a guard escort; she had restricted
dayroom and recreation time; defendants' unjustifiably delayed in
responding or ignored her requests for medical care; defendants'
unjustifiably delayed in responding to her requests for personal
items, such as a bra; she was subjected to physical violence
(namely, the incident with Deputy Mendonsa, who plaintiff argues
responded so quickly and violently to the interchange between
them because of plaintiff's T-Sep classification); she was
subjected to daily verbal harassment by inmates, and subjected by
jail policy to humiliating "laundry calls" where she was forced
to walk half-naked, with her breasts exposed, through the jail.

create a presumption of punitiveness, and the County has not offered in rebuttal "legitimate, non-punitive justifications" for plaintiff's classification.  Id.  As stated in Jones, the County must show how the "bevy of restrictions [plaintiff] faced in T-Sep was not 'excessive in relation to'" the alleged safety purpose in keeping her segregated and "why this purpose could not have been achieved by alternative and less harsh methods."  Id. at 934-35.  The sufficiency of this showing must be measured by the trial jury.

Finally, with respect to plaintiff's claim against defendant Sheriff Blanas, sued in both his official and individual capacity, plaintiff likewise can withstand summary judgment for similar reasons.  Regarding plaintiff's claim against Sheriff Blanas in his official capacity, such suits "generally represent . . . another way of pleading an action against an entity of which an officer is an agent."  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (citing Monell v. New York City Dept. of Soc. Svcs., 436 U.S. 658, 690 n. 55 (1978)).  To hold defendant liable in his official capacity, plaintiff must show that a policy or custom or a one time decision by a governmentally authorized decision maker played a part in the violation of federal law. McRorie v. Shimoda, 795 F.2d 780, 783 (9th Cir. 1986).

Defendant Blanas was the Sheriff of Sacramento County at all relevant times, and thus, the official responsible for policies, practices, and customs in the jail.  As discussed in the court's analysis of defendant County's municipal liability, plaintiff has presented evidence that the jail policy regarding classification of transgender inmates played a part in the alleged

19

constitutional violations of plaintiff.  <u>See</u> <u>Kentucky v. Graham</u>,
473 U.S. 159, 166 (1985) ("[I]n an official-capacity suit, the
entity's policy or custom must have played a part in the
violation of federal law.") (internal quotation omitted).  Based
upon this evidence, a reasonable juror could conclude that
Sheriff Blanas developed, implemented, or maintained policies
that he knew or reasonably should have known were deliberately
indifferent to plaintiff's rights and were a moving force in the
violations of her constitutional rights. <u>See</u> <u>Redman v. County of</u>
<u>San Diego</u>, 942 F.2d 1435, 1448 (9th Cir. 1991).  Thus,
defendants' motion for summary judgment on the basis of defendant
Blanas' official liability must be denied.

     With respect to Sheriff Blanas' personal liability, in the
case of a supervisor, "individual liability hinges upon
his participation in the deprivation of constitutional rights."
<u>Larez v. City of Los Angeles</u>, 946 F.2d 630, 646 (9th Cir. 1991).
This participation may involve the setting in motion of acts
which cause others to inflict constitutional injury.  <u>Johnson v.</u>
<u>Duffy</u>, 588 F.2d 740, 743-44 (9th Cir. 1978).  For Sheriff Blanas
to be liable in his individual capacity, plaintiff must
demonstrate: (1) that his "own culpable action or
inaction in the training, supervision, or control of his
subordinates" caused the constitutional injury; (2) that he
"acquiesce[d] in the constitutional deprivations of which [the]
complaint is made;" or (3) that their conduct showed a "reckless
or callous indifference to the rights of others." <u>See</u> <u>Larez</u>, 946
F.2d at 646 (internal citations omitted).  Here, as a result of
the highly unusual confluence of both <u>Tates</u> and <u>Jones</u> in which

Sheriff Blanas was a party, plaintiff has raised a triable issue as to the Sheriff's personal liability in the treatment of transgender inmates at the jail.

Defendant argues nonetheless that even if a basis exists for Sheriff Blanas' personal liability, he is entitled to qualified immunity.  The doctrine of qualified immunity protects from suit government officers who do not knowingly violate the law. Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994). An officer can establish qualified immunity by demonstrating (1) that the law governing his conduct was not clearly established at the time of the challenged actions, or (2) that under the clearly established law, he could reasonably have believed that the alleged conduct was lawful.  See Katz v. United States, 194 F.3d 962, 967 (9th Cir. 1999); Mendoza v. Block, 27 F.3d 1357, 1360 (9th Cir. 1994); see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (observing that police officers "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.")

Thus, the initial inquiry that the court must make to determine whether an official is entitled to qualified immunity is whether taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Based upon the court's analysis of Sheriff Blanas' liability above, the court has found that plaintiff has presented sufficient evidence for a reasonable juror to find that

1  a constitutional violation occurred.

2      If, as in this case, a violation could be made out on a

3  favorable view of the parties' submissions, the next inquiry is

4  whether the constitutional right was clearly established.

5  This inquiry must be taken in the light of the specific context

6  of the case; the contours of the right must be sufficiently

7  clear that a reasonable official would understand that what he

8  is doing violates that right.  Id.  The salient question is

9  whether the law at the time of the disputed conduct gave

10  defendants "fair warning that their alleged treatment of

11  [plaintiff] was unconstitutional."  Hope v. Pelzer, 536 U.S. 730,

12  741 (2002).

13      In light of the Tates federal court decision and order

14  delineating the constitutional parameters for the classification

15  and treatment of transgender inmates at the Sacramento County

16  Main Jail, Sheriff Blanas had "fair warning" that the jail's

17  classification and treatment of plaintiff may be

18  unconstitutional.  Sheriff Blanas is accordingly not entitled to

19  qualified immunity.  Thus, personal liability is an ineluctable

20  trial issue in this case.

21          **3.   State Law Claims**

22      Defendants move for summary judgment on plaintiff's state

23  law claims against the "Doe" defendants.  To date, plaintiff has

24  not sought leave to amend her second amended complaint to

25  substitute actual defendants for the "Doe" defendants.  (SUF 6.)

26  While plaintiff was not prohibited from naming such "Doe"

27  defendants in her complaint, pursuant to the court's scheduling

28  order, to substitute in named parties, she must seek leave of

22

court.  (Pretrial Scheduling Order, filed Sept. 13, 2004, at 1:20-21 ["All named defendants have been served and no further service is permitted without leave of court, good cause having been shown."].)  Pursuant to that order, to amend, plaintiff was required to file a motion pursuant to Federal Rule of Civil Procedure 16.  (Id. at 1:23-24 ["No further joinder of parties or amendments to pleadings is permitted without leave of court, good cause having been shown."].)  No such motion has been filed.

Instead, after discovery has closed (on November 30, 2005), plaintiff, only *now*, in response to defendants' motion for summary judgment asks for leave to "amend to proof at this time," to name "Sheriff Blanas, the County and Jail employees" as defendants on the state law claims.  As apparent justification for her request, she notes that by the parties' stipulation, Deputy Mendonsa's deposition is still continuing.  However, plaintiff offers no further information or explanation as to why Mendonsa's deposition is critical to her state law claims against the proposed parties.  Plaintiff has failed wholly to substantiate her basis for leave to amend at this late juncture, where discovery has closed and the dispositive motion cut-off has passed.  Having shown no good cause, the court grants defendants' motion as to these causes of action.

///
///
///
///
///
///

23

1

**CONCLUSION**

2      For the foregoing reasons, defendants' motion for summary

3  judgement is granted in part and denied in part.  The motion is

4  granted with respect to plaintiff's state law claims against the

5  unnamed "Doe" defendants; the motion is denied with respect to

6  plaintiff's Section 1983 claim against defendants for violation

7  of plaintiff's Fourteenth Amendment rights.

8      IT IS SO ORDERED.

9   DATED: February 24, 2006

10

11                              /s/ Frank C. Damrell Jr.
                                FRANK C. DAMRELL, Jr.
12                              UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28